**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

WILLIE MACON,

Plaintiff,

vs.

CASE NO.:

GOLD N CONNECTION LLC
Florida Limited Liability Company
d/b/a GC PAWN LAKELAND

INJUNCTIVE RELIEF SOUGHT

Defendant(s).

# COMPLAINT

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues GOLD N CONNECTION LLC, Florida Limited Liability Company, d/b/a GC PAWN LAKELAND ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant to Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set forth in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.gcpawn.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2. MACON files this lawsuit because Defendant's policies exclude him, and millions of other potential consumers, from fully and equally enjoying Defendant's products and services.

3. Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, Tampa Division, pursuant to 28 U.S.C. § 1391(b) and Internal Operating Procedures for the United States District Court of the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Polk County, Florida.

6. Defendant attempts to and indeed does, participate in Polk County's economic life by offering and providing products and services over the internet to Polk County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 1555 S Combee Rd, Lakeland, FL 33801 (hereinafter "Defendant's Principal Place of Business"), which is located in Polk County, Florida.

8. MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9. MACON is a natural person over the age of 18 and is blind.

10. MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11. MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12. MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an

> arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15. Defendant is a Florida Limited Liability Company with a principal place of business of 1555 S Combee Rd, Lakeland, FL 33801 (hereinafter "Defendant's Principal Place of Business").

16. Defendant operates a pawn and retail business under the name GC Pawn, purchasing merchandise, providing collateral-based pawn loans, and selling new and used goods. Defendant's merchandise includes jewelry, watches, electronics, computers, cell phones, tools, musical instruments, sporting goods, and

other consumer products. Defendant maintains Defendant's Website to provide information concerning its merchandise, pawn services, buying services, and physical locations. Defendant's Website also provides inventory searches, product prices, shopping-cart and layaway options, customer account access, and forms for merchandise requests and customer inquiries.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18. Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as a "place of public accommodation."

19. Defendant offers goods and services to the public through its physical GC Pawn business in Lakeland, Florida, and maintains Defendant's Website as a digital extension of that business. Defendant's Website serves multiple physical locations and allows customers to search merchandise by category and location, including inventory specifically available at the Lakeland store. Customers may review product listings and prices, sort inventory by price or newest items, add merchandise to a shopping cart, and select layaway options. Defendant's Website

also allows customers to register for and access a customer account, submit wish-list requests describing merchandise they would like Defendant to locate, and submit inquiries concerning inventory, pawn loans, selling merchandise, and customer account access. Additionally, Defendant's Website provides information about merchandise accepted for pawn, the process for obtaining a collateral-based loan, and the physical locations' addresses, telephone numbers, and operating hours. These functions provide customers the opportunity to shop and pre-shop Defendant's goods and research its services before visiting the physical business. Defendant owns, controls, and operates Defendant's Website in direct connection with its physical business, making Defendant's Website a gateway to the goods and services available at that business.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the

Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

**FACTUAL AND SUBSTANTIVE ALLEGATIONS**

21. MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22. During MACON's Website Visits, MACON attempted to use Defendant's Website to browse merchandise available at Defendant's Lakeland location and obtain location information before visiting the store, the same functions available to non-disabled customers through Defendant's Website. Improperly structured headings and category checkboxes that were not programmatically associated with their group labels prevented MACON from independently navigating and completing these functions using his screen reader software. Defendant's failure to make these functions accessible to MACON's screen reader software denied MACON the same access to Defendant's goods that Defendant's Website provides to non-disabled customers.

23. Defendant's Website is additionally used to search for brick-and-mortar locations, check Defendant's hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to shop and pre-shop Defendant's offerings available for purchase at Defendant's Principal Place of Business and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Principal Place of Business from his home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MACON's in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. July 08, 2026;

b. July 27, 2026 and

c. August 13, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28. While notice to Defendant is not required, MACON sent a pre-suit communication on July 27, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30. However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31. MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations,

transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . .

However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

38. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).
[2] 42 U.S.C. § 12188(b).
[3] 42 U.S.C. § 12188(a).
[4] Johnson, *supra* note 1.
[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).
[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40. Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42. Defendant's Website has a direct nexus to Defendant's physical business because it provides information concerning the business's merchandise and services, its physical address, telephone number, and operating hours, and inventory available at the Lakeland location. Defendant's Website is a digital extension of Defendant's physical business and provides customers the opportunity to shop and pre-shop jewelry, watches, electronics, computers, cell phones, tools, musical instruments, sporting goods, and other merchandise from their homes. Through Defendant's Website, customers can search and filter inventory by category and

---

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

location, review merchandise and prices, select shopping-cart and layaway options, register for and access customer accounts, request particular merchandise through a wish-list form, and contact Defendant concerning its goods and services. Customers can also research Defendant's pawn and buying services before traveling to the store. These functions would allow MACON to independently evaluate Defendant's goods and services and plan a visit without first undertaking physical travel, which is more difficult for MACON because he is blind. The accessibility barriers on Defendant's Website prevent MACON from obtaining equal access to these functions through his screen reader software.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49. Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

a. **The "GCPAWN.COM GOLD N CONNECTION" logo has incomplete alternative text**

   i. **Issue:** The "GCPAWN.COM GOLD N CONNECTION" logo image has been assigned incomplete alternative text defined as "GCPawn Homepage," which fails to accurately convey the meaningful branding information presented visually within the logo, including the full company name. Consequently, screen reader users are unable to receive the same brand identification information that is readily available to sighted users.




ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, the incomplete alternative text assigned to the "GCPAWN.COM GOLD N CONNECTION" logo creates a significant barrier to brand recognition and orientation. Because the alternative text "GCPawn Homepage" omits the full company name and associated branding information visible to sighted users, blind users are denied an equivalent experience and cannot independently identify the business they are interacting with. The logo image should include meaningful alternative text that conveys all visually presented information, including the business name and any meaningful tagline or branding text, without unnecessary phrases such as "image of" or "logo of,"

so that screen reader users receive a fully equivalent experience.

**b. The "SELL YOUR GOLD..." content is presented as an image of text**

i. **Issue:** The social media links on the page open in a new window; however, this behavior is not communicated programmatically to assistive technologies. Screen reader users are not informed that activating these links will result in a new window opening, creating a significant barrier to understanding the expected outcome before interacting with the links.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, the absence of programmatic

notification that social media links open in a new window creates a disorienting and unpredictable browsing experience. Blind users who cannot visually anticipate context changes are left without the information needed to make informed decisions before activating a link. The social media links should clearly communicate through their accessible name or description that they open in a new window or tab, ensuring that screen reader users receive the same navigational awareness as sighted users and can understand the expected behavior prior to activating any link.

**c. Important text is presented as images of text**

i. **Issue:** The content reading "WE BUY AND SELL MOTORCYCLES! Get your next ride with us.," "WE CAN AUTHENTICATE YOUR DESIGNER HANDBAG GCPAWN with entrupy.," and "MAKE LOAN & LAY-AWAY PAYMENTS ONLINE Ask us how." is rendered as images of text rather than actual HTML text. Where no accessible text alternative is provided, screen reader users are unable to access this important content, creating a significant barrier to the information conveyed on the page.




ii. **WCAG 2.1 AA Violations:** 1.4.5 - AA, 1.1.1 - A - Images Of Text

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, the presentation of critical informational content as images of text—without equivalent accessible text alternatives—results in a complete loss of access to that content. Blind users are unable to hear this information read aloud, leaving them unaware of key services and offerings communicated to sighted users. The visible text should be implemented as actual HTML text so that screen readers can access and announce it as regular page content, and so that it remains readable when users resize or customize the page presentation. Where an image containing text is unavoidable, an equivalent accessible text alternative must be provided to convey the same information.

**d. The link text, image link, and "Read More" link have the same destination, creating redundant links**

i. **Issue:** The link text, image link, and "Read More" link exist as separate interactive elements that each navigate to the same destination. These duplicate links provide no additional value and result in unnecessary repetition within the page's interactive structure. Screen reader users who navigate through links encounter multiple elements serving the same purpose, creating an inefficient and confusing navigation experience.




ii. **WCAG 2.1 AA Violations:** 2.4.4 -A - Link Purpose In Context

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, the presence of multiple redundant links pointing to the same destination significantly

impedes efficient page navigation. Blind users who navigate by links or interactive elements are forced to encounter and evaluate repeated entries that serve no distinct purpose, increasing cognitive load and reducing the overall usability of the page. When multiple elements within the same content block—such as an image, a title, and a "Read More" link—point to the same destination, they should be consolidated into a single link with a clear and consistent accessible name, eliminating unnecessary repetition and providing a more efficient and meaningful navigation experience for screen reader users.

**e. Decorative images are defined with alternative text**

i. **Issue:** Decorative images on the page have been assigned alternative text despite conveying no meaningful information and serving no functional purpose. As a result, screen readers announce these images unnecessarily, introducing irrelevant content into the reading experience and impeding efficient page navigation for screen reader users.




ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, the unnecessary announcement of decorative images introduces irrelevant and distracting content into the auditory reading experience. Blind users must listen to and process announcements for images that carry no informational value, increasing cognitive burden and reducing the efficiency with which they can navigate and consume meaningful page content. Images that are purely decorative should be hidden from assistive technologies by assigning an empty alternative text value (alt="") or by implementing them as CSS background images, ensuring that screen readers bypass decorative content entirely and present only information that is meaningful and relevant to the user.

**f. The "Find the closest GCPAWN location near you" text is not defined as a heading**

i. **Issue:** The "Find the closest GCPAWN location near you:" text visually identifies a distinct section of the page but is not programmatically defined as a heading element. Because no semantic heading role is assigned, screen reader users cannot identify this text as a section heading or use heading navigation to move directly to this content, creating a significant barrier to efficient page navigation.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, the absence of a programmatically defined heading means this section is indistinguishable from surrounding body text. These users are unable to identify the

text as a navigational landmark or jump directly to it using heading navigation, forcing them to traverse the entire page linearly. The "Find the closest GCPAWN location near you:" text should be assigned an appropriate heading level consistent with the page's existing heading hierarchy, enabling screen readers to announce it as a heading and allowing users to navigate to it efficiently. The heading should accurately describe the content that follows so that users can make informed navigation decisions.

**g. Incorrect Heading Levels Used for Section Titles**

i. **Issue:** The "TOP CATEGORIES", "NEWS & UPDATES", "HELPING YOU GET THE CASH YOU NEED", and "VISIT US" headings are programmatically defined as `` elements when they represent primary sections directly subordinate to the page's main heading, requiring them to be defined as `` elements. The use of an incorrect heading level produces an inaccurate document structure that misrepresents the hierarchical relationship between page sections and prevents screen reader users from understanding

the correct organization of the page's content when navigating by headings.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers to navigate by headings, the incorrect assignment of `` to these primary section titles distorts the perceived document hierarchy. These users depend on a logical and consistent heading structure to understand the relationship between sections and to move efficiently through page content. When heading levels are skipped or incorrectly assigned, screen reader users receive a misleading representation of the page's organization, making it impossible to determine which sections are primary and which are subordinate. These headings should be defined as

`` elements if they are direct subsections of the page's main `` heading, and all heading levels throughout the page should follow a logical, sequential hierarchy without unnecessary gaps, enabling screen reader users to navigate and comprehend the page structure effectively.

**h. The "Watches" heading is incorrectly defined as an H3 instead of an H2**

i. **Issue:** The "Watches" heading is programmatically defined as an `` element despite representing a section at the `` level within the page's heading structure. This incorrect heading level assignment produces an inaccurate document hierarchy and prevents screen reader users from understanding the proper structural relationship between page sections when navigating by headings.



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, an incorrectly assigned heading level for the "Watches" section creates a misleading representation of the page's content hierarchy. When navigating by headings, these users rely on a consistent and logical heading order to understand how sections relate to one another and to move efficiently through the page. Assigning an `` to a section that structurally belongs at the `` level causes screen reader users to misinterpret the relationship between the "Watches" section and surrounding content. The "Watches" heading should be programmatically defined as an `` to accurately reflect its position in the page hierarchy. All heading levels throughout the page should follow a logical and consistent order, with no levels skipped or incorrectly assigned, so that screen reader users can navigate through headings and accurately understand the relationship between main sections and their subsections.

**i. Checkboxes are not grouped with their respective group labels**

i. **Issue:** The checkboxes present on the page are not programmatically grouped with their respective group labels. No semantic grouping mechanism, such as a `` and `` or an equivalent ARIA construct, is used to associate each set of checkboxes with its corresponding category label. As a result, screen reader users cannot determine which label or category a given set of checkboxes belongs to, creating a significant barrier when attempting to identify and select the required options.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, the absence of programmatic grouping between checkboxes and their associated group labels makes it impossible to determine the context or

category of each checkbox before making a selection. Without a group label being announced when entering or navigating through a checkbox group, these users lack the information necessary to understand what they are selecting, which can result in errors or an inability to complete required interactions. Each group of related checkboxes should be associated with a clear, programmatically defined group label so that screen readers announce the group label when users enter or navigate through the checkbox group. Users should be able to identify the category each checkbox belongs to before making a selection, ensuring an equitable and independently navigable form experience.

51. Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about July 19, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52. More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

53. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant 's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57. Here, however, MACON, through counsel, did send a pre-suit communication informing Defendant of the barriers to access on July 27, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58. As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59. Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60. Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61. MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief; including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during

that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are

aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish

final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

**Certification Under Penalty of Perjury That Artificial Intelligence Was Used in the Preparation of This Filing**

I have reviewed the Standing Order Requiring Disclosure of the use of artificial intelligence. Artificial intelligence was used in the preparation of this filing in the following way: The firm's case-management software uses AI to populate documents with case-specific information from the firm's records, creating a preliminary draft. Before filing, the signing attorney independently verifies that information against the underlying records, makes any necessary revisions, and reviews and finalizes the document. This automated population process does not perform legal research or generate case citations. The attorney then continues working on the document, reviewing all initial entries, and finalizing it before filing. The Case Management Software input does not involve legal research or case citations. However, under penalty of perjury, I certify that before filing, I personally reviewed Rule 11 of the Federal Rules of Civil Procedure and I personally read every case. I understand that if a case upon which I rely does not exist or does not reasonably stand for the cited proposition, the Court may treat this as a violation of Rule 11 of the Federal Rules of Civil Procedure. I have reviewed Rule 11 of the Federal Rules of Civil Procedure and I understand that this rule applies equally to counsel and unrepresented parties, that as the person signing this filing I am the person who will be held responsible for its contents even if it was prepared by someone else, and I am familiar with the sanctions available for violations of Rule 11. If this certification is made by counsel, I further understand that citation to a case that either does not exist or does not reasonably stand for the cited proposition may be treated as a violation of my oath of candor toward the tribunal and a basis on which my admission to practice in the Middle District of Florida could be revoked or suspended. Further, whether I represent myself or I am an attorney representing a client, I understand that by making this certification under penalty of perjury I could be referred for criminal prosecution if the statements I make here are false.

Dated: October 12, 2026 Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418

Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**